IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Barbara Thomas, ) | |
| ) | Civil Action No. 8:04-21935-CMC-BHH |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Jo Anne B. Barnhart, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was not entitled to disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").

**ADMINISTRATIVE PROCEEDINGS**

On October 5, 1999, the plaintiff filed applications for DIB and SSI alleging disability beginning September 22, 1999. The applications were denied initially and on reconsideration. On June 2, 2000, the plaintiff requested a hearing, which was held on March 13, 2001. Following the hearing, at which the plaintiff, her representative and a

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

vocational expert appeared, the administrative law judge considered the case *de novo*, and on June 22, 2001, determined that the plaintiff was not entitled to benefits. On February 13, 2002, the Appeals Council remanded the case to the ALJ for further proceedings.

A supplemental hearing was held on June 11, 2002, at which the plaintiff, her attorney and a vocational expert appeared. At this hearing, the plaintiff amended her alleged disability onset date to August 16, 2000. On January 23, 2004, the ALJ again found that the plaintiff was not entitled to benefits. This determination became the final decision of the Commissioner when it was adopted by the Appeals Council on June 18, 2004.

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

> (1) The claimant has not engaged in any substantial gainful activity since August 16, 2000, her amended alleged date of disability onset.
>
> (2) The medical evidence establishes the claimant's back pain, cardiovascular hypertension, depression, and anxiety are "severe" impairments as defined in the regulations, but not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart F, Regulations No. 4.
>
> (3) The claimant has medical impairments that could reasonably cause some of her subjective symptoms; however, the evidence does not substantiate her allegations concerning the level of severity of physical limitations, pain, or restrictions due to mental disorder. Therefore, such allegations are less than fully credible.
>
> (4) The claimant has retained the residual functional capacity to perform work with restrictions that require no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; no pushing or pulling over 20 pounds; no standing and/or walking over 6 hours in an 8-hour work day; simple, routine work with one or two step instructions; a supervised, low stress environment; no interaction with the public; limited stooping, twisting, crouching, kneeling and climbing of stairs or ramps; no crawling, balancing, or climbing of ladders or scaffolds; and an environment free from extremes of temperature.

>   (5)    The claimant is unable to perform the requirements of her past relevant work as a licensed practical nurse, patient care technician, packager, or teacher.
>
>   (6)    The claimant's acquired skills are not transferable due to the residual functional capacity restriction to simple, routine work.
>
>   (7)    The claimant has the residual functional capacity to perform a significant range of light work.
>
>   (8)    The claimant is 50 years of age and has more than a "high school" education.
>
>   (9)    Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rules 202.21 and 202.14 as a framework for decision making, there are a significant number of jobs in the national economy that she could perform. Examples include the light, unskilled jobs of small parts assembler, garment sorter, and garment folder, with over 630,000 such jobs in the national economy.
>
>   (10)   The claimant was not under a "disability," as defined in the Social Security Act and regulations, at any time through the date of this decision.

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the

4

Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

In November 1998, Christopher M. O'Connor, M.D., a cardiologist, suspected that the plaintiff's exertional dyspnea and chest pains were probably related to esophageal pathology (Tr. 169-70). On January 27, 1999, the plaintiff underwent an esophagogastrodeodenoscopy ("EGD"), which revealed diagnoses of a small sliding hiatal hernia, gastritis, and gastroesophageal reflux disease ("GERD") (Tr. 172-73).

In May 1999, Jeffrey D. Seder, M.D., a cardiologist, noted that the plaintiff's gastritis and hiatal hernia were doing better and that her cardiovascular hypertension was controlled (Tr. 175). On May 28, 1999, the plaintiff was seen for rectal bleeding apparently due to diverticulosis (Tr. 176-77). On June 8, 1999, the plaintiff denied any recurrence of rectal bleeding (Tr. 260).

On June 17, 1999, Stephen L. Lanuti, M.D., saw the plaintiff for complaints of a choking feeling and discomfort while lying down (Tr. 182). Dr. Lanuti recommended that the

5

plaintiff undergo an EGD and colonoscopy, which revealed GERD, mild gastritis, small sliding hiatal hernia, very snug pylorus, diffuse diverticulosis, and hemorrhoids (Tr. 185-87).

On September 24, 1999, the plaintiff was hospitalized for complaints of intermittent chest pain, left arm numbness, mild shortness of breath, nausea, and vomiting (Tr. 201-16).  A heart catheterization showed 20-25% lesion of the coronary arteries and no significant coronary artery disease; an electrocardiogram showed nonspecific T-wave abnormalities; an echocardiogram showed normal left ventricular size and function; a myoview SPECT scan was normal with an ejection fraction of 70% and no evidence of ischemia; and a CT scan did not reveal any aortic dissection (Tr. 201).  Myocardial infarction was ruled out (Tr. 201).  Upon discharge the plaintiff's blood pressure was under control (Tr. 201).  The discharge diagnoses were chest pain syndrome, possible microangiopathy or syndrome X, chest wall pain. hypertension, GERD and depression (Tr. 201).

On October 20, 1999, Valeriana Esteves-Jute, D.O., completed a medical report form at the request of the South Carolina Disability Determination Division (Tr. 249-50). Dr. Esteves-Jute noted that the plaintiff had a history of recurrent malignant hypertension with unstable angina, that she had multiple hospitalizations with no apparent success in controlling her hypertension and angina, and that she continued to be at risk of stroke and myocardial infarction with her hypertension (Tr. 249).  She opined that the plaintiff was unemployable until her medical diseases were controlled (Tr. 250).

On October 26, 1999, the plaintiff called Dr. Esteves-Jute's office requesting a refill of her blood pressure medication; she stated that she had been out of the medication for one week and began having headaches and chest pain (Tr. 253). On November 9, 1999, the plaintiff complained of dizziness, but again reported that she had been out of her medication for two weeks (Tr. 248). On November 16, 1999, Dr. Esteves-Jute noted that the plaintiff's hypertension was controlled (Tr. 247).

On December 17, 1999, Edward D. Waller, Ph.D., a psychologist, completed a psychiatric review technique form. He noted that the plaintiff suffered from affective disorders, anxiety-related disorders, personality disorders, major depression, and borderline personality traits. He opined that the plaintiff had moderate limitations in her activities of daily living and maintaining social functioning and would often suffer deficiencies of concentration, persistence or pace, resulting in failure to complete tasks in a timely manner in work settings. He stated that in his opinion the plaintiff could "perform simple tasks for 2+ hours with no special supervision," and that she may miss an "occasional workday due to mental problems." He stated that the plaintiff may experience "occasional interpersonal difficulties with co-workers and supervisors due to borderline personality traits. She will likely need a job that does not require contact with the public." He found that the plaintiff could make simple work related decisions, ask assistance from others, and use public transportation (Tr. 316-28).

On February 1, 2000, the plaintiff was admitted to Scotland Memorial Hospital for complaints of vomiting, diarrhea, cough, sore throat, fever chills, and chest tightness (Tr. 217-19). Myocardial infarction was ruled out on the basis of EKGs, serial cardiac enzymes, and a stress test (Tr. 217). On March 13, 2000, the plaintiff had increased cholesterol, but she told Dr. Esteves-Jute that she had not taken her medication for one week (Tr. 244). She received treatment from Tri-County Mental Health Center between August 2000 and February 2001 (Tr. 298-305, 329-31). In August 2000, a clinician (signature illegible) diagnosed bipolar disorder. The plaintiff was given a Global Assessment of Functioning ("GAF")[2] score of 41 (Tr. 304-305). In September 2000, the plaintiff was prescribed Paxil (Tr. 300). In October 2000, the plaintiff indicated that she felt "a little calmer" (Tr. 298). In January and February

---

[2] The GAF considers psychological, social, and occupational functioning on a hypothetical continuum of mental health or illness. A score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *See Diagnostic and Statistical Manual of Mental Disorders - Text Revision, (DSM-IV-TR)* (2000) (STAT! Ref Library CD-ROM, Fourth Quarter 2004).

7

2001, the plaintiff's dosage of Paxil was increased (Tr. 329). In February 2001, the plaintiff was treated for rectal bleeding probably secondary to hemorrhoids (Tr. 389-91).

On May 6, 2001, the plaintiff sought emergency room treatment for anxiety, jittery chest, shortness of breath, heavy chest, and weakness (Tr. 356-60). An EKG revealed no significant findings. The plaintiff was diagnosed with anxiety disorder, hyperventilation syndrome, and atypical chest pain (Tr. 357).

In a letter dated August 28, 2001, Dr. Esteves-Jute wrote:

> This letter is to inform you that Ms. Barbara Thomas has been under my care for the past three years and has been diagnosed with the following chronic conditions: cardiac hypertension, microcalcification of the heart vessels leading to syndrome x causing recurrent chest pain, diverticulosis, panic attacks, hyperlipedemia[.] [A]ll of these conditions have lead to a severe major depression that disables my patient from employment. Ms. Thomas has been under the care of Dr. Bartel[3] for her mental illness.

(Tr. 344, 370).

On April 16, 2002, Fazal Khan, M.D., a physician at Tri-County Mental Health, completed an assessment of the plaintiff's abilities to perform work-related activities (Tr. 381-83). Dr. Khan rated her as "poor" in the following categories: following work rules; relating to co-workers; dealing with the public; interacting with supervisors; dealing with work stresses; functioning independently; maintaining attention/concentration; understanding, remembering, and carrying out complex, detailed, and simple job instructions; relating predictably in social situations; and demonstrating reliability (Tr. 381-82). He rated the plaintiff as "fair" in using judgment, maintaining personal appearance; and behaving in an emotionally stable manner (Tr. 381-82). Dr. Khan noted that the plaintiff has multiple medical problems as well as major depressive disorder (Tr. 382).

---

[3] At the hearing, the plaintiff testified that Dr. Bartel was her doctor until he transferred to another office. Since that time, Dr. Fazal Khan has been her doctor (Tr. 436).

8

On May 15, 2002, the plaintiff sought emergency room treatment for vomiting and headache (Tr. 355). However, she left without receiving treatment (Tr. 354). On June 10, 2002, Dr. Esteves-Jute wrote:

> This letter is to inform you that Ms. Barbara Thomas has been under my care for the past three years and has been diagnosed with the following chronic conditions: cardiac hypertension, microcalcification of the heart vessels leading to syndrome X causing recurrent chest pain, diverticulosis, panic attacks, hyperlipedemia, non-insulin dependent diabetes, Grave's disease. All of these conditions have lead to a severe major depression that disables my patient from employment. Ms. Thomas has been under the care of Dr. Bartel for her mental illness.

(Tr. 384).

On March 14, 2003, Al B. Harley, Ph.D., saw the plaintiff for a consultative psychological evaluation (Tr. 395-97). Dr. Harley diagnosed her with major depression (Tr. 397). He rated the plaintiff's impairment as "moderate" in the following categories: understanding, remembering, and carrying out short, simple instructions; interacting appropriately with the public, supervisor(s), and co-workers; and responding appropriately to changes in a routine work setting (Tr. 398-99). He rated the plaintiff's impairment as "marked" in the following categories: understanding, remembering, and carrying out detailed instructions; making judgments on simple work-related decisions; and responding appropriately to work pressures in a usual work setting (Tr. 398-99). Dr. Harley also indicated that the plaintiff's physical capability was affected by her cardiovascular concerns (Tr. 399). He opined that the plaintiff was tense and depressed and that this, along with her somatic concerns, caused problems with focusing (Tr. 398).

On March 14, 2003, Douglas W. Jenkins, M.D., saw the plaintiff for a consultative physical examination (Tr. 400-04). An EKG and chest x-ray were normal (Tr. 402). Dr. Jenkins diagnosed exertional dyspnea of questionable etiology, tobacco abuse,

history of hypertension; and history of diabetes (Tr. 402). Dr. Jenkins found that the plaintiff could perform light work (Tr. 405-08).

The plaintiff testified at the hearing that she can bathe and dress herself and can prepare light meals (Tr. 427). She drives approximately twice per week to the drugstore or to the doctor's office. She testified that she sees Dr. Esteves-Jute two to three times per month (Tr. 432). She also sees Dr. Khan once a month and a nurse at Tri-County Mental Health twice a month for counseling (Tr. 435-36). The plaintiff's medications include a nitroglycerin patch, Procardia, aspirin, Prilosec, Premarin, Lorazepam, Paxil, Furosemide, potassium, Celebrex, iron, Bactrim, Centrum, Motrin, Rolaids, and Senokot (Tr. 142-45).

At the hearing, vocational expert Carroll Hart Crawford testified in response to the ALJ's hypothetical that a person of the claimant's education and experience who is limited to performing work with restrictions of no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; no pushing or pulling over 20 pounds; no standing or walking over six hours; simple routine work with one- or two-step instructions; supervised, low stress environment; no interaction with the public; limited stooping, twisting, crouching, and kneeling; no crawling or climbing; and environment free of temperature extremes could perform the light, unskilled jobs of small parts assembler, garment sorter, and garment folder (Tr. 47-71). When the plaintiff's attorney asked whether a hypothetical person could perform those jobs if she often suffered from deficiencies in concentration, persistence, or pace that would prevent her from performing tasks in a timely manner, the vocational expert replied that she could not (Tr. 471).

## **DISCUSSION**

The plaintiff alleges disability commencing August 16, 2000, due to hypertension, stress, depression, shortness of breath, vomiting, fatigue, and chest, arm, and back pain (Tr. 97). The plaintiff was 47 years old at the time of the ALJ's decision, and she

has a high school education and one and a half years of college. She has past relevant work experience as a nurse's aide and sewing machine operator (Tr. 98, 103).

The ALJ determined that the plaintiff had the residual function capacity to perform a significant range of light work (Tr. 31).   The plaintiff alleges that the ALJ erred in not giving controlling weight to the opinion of her treating physicians, Dr. Esteves-Jute and Dr. Kahn.  As set forth above, Dr. Esteves-Jute opined in October 1999 that the plaintiff was unemployable until her medical diseases were controlled (Tr. 250).  In August 2001 and June 2002, Dr. Esteves-Jute wrote that the plaintiff's cardiac hypertension, microcalcification of the heart vessels leading to syndrome X causing recurrent chest pain, diverticulosis, panic attacks, and hyperlipedemia had led "to a severe major depression," disabling the plaintiff from employment (Tr. 344, 384).  In April 2002, Dr. Khan rated the plaintiff as "poor" in the following categories:  following work rules; relating to co-workers; dealing with the public; interacting with supervisors; dealing with work stresses; functioning independently; maintaining attention/concentration; understanding, remembering, and carrying out complex, detailed, and simple job instructions; relating predictably in social situations; and demonstrating reliability (Tr. 381-82).  He rated the plaintiff as "fair" in using judgment, maintaining personal appearance; and behaving in an emotionally stable manner (Tr. 381-82).

"A decision not supported by substantial evidence must be reversed. Additionally, '[f]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir. 1988) (quoting *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir.1984)).  The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. §416.927(d)(2)(2004); *Mastro v. Apfel*, 370 F.3d 171 (4th Cir. 2001).

11

However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. Social Security Ruling 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

Thus, as a threshold matter, the ALJ is required to determine whether a physician's opinion is "well supported by medically acceptable clinical and diagnostic techniques and is not inconsistent with the other substantial evidence" in the record and thus entitled to controlling weight. The ALJ here made such a determination. In discounting the opinion of Dr. Esteves-Jute, the ALJ stated:

> I find that the overall evidence, including the clinical findings and observations of all treating and examining physicians, which are set forth above, does not support a finding that the claimant has an impairment or combination of impairments of the severity as to preclude all work activity. While Dr. [Esteves-]Jute stated that the claimant has severe angina, coronary artery disease, hypertension, diverticulosis, hyperlipidemia, panic attacks, and depression, which prevented her from working, the overall objective evidence, including Dr. [Esteves-]Jute's own clinical findings, does not support her opinion. The claimant has not been shown to have any significant coronary artery disease, her hypertension and angina are generally well controlled when she is compliant with her medication, her diverticulosis was effectively treated with medication, and as shown by the evidence, the claimant does not have a significant cardiac impairment. Dr. [Esteves-]Jute reported the claimant had no abnormalities of her neck, heart, abdomen, or respiratory system; had no neurological abnormalities; and had normal concentration, judgment, gait, station, range of motion, stability, and strength.

(Tr. 30).

There is substantial evidence in the record to support this finding. As argued by the defendant (def. brief 7-8), the plaintiff's coronary artery disease, hypertension, angina,

12

and diverticulosis were effectively treated (Tr. 30). Myocardial infarction was ruled out on at least two occasions (Tr. 201, 201, 217-19), and the plaintiff's hypertension was controlled with medication (Tr. 175, 201, 247, 401). The record indicates that the plaintiff was diagnosed only with diverticulosis without any resulting limitations (Tr. 185-87). Further, Dr. Jenkins, an examining physician, found the plaintiff capable of performing light work (Tr. 405-408).

The ALJ analyzed the plaintiff's mental impairments as follows:

> The evidence demonstrates the claimant has mental impairments of depression and anxiety that may impose some work limitations upon the claimant, such as decreased concentration, problems working with the public and dealing with stressful situations. However, mental status examinations by different physicians consistently reveal the claimant was alert, oriented, had normal judgment, fair attention span, and good memory; that she was not suicidal; and that she had disturbed sleep which improved with medication. However, there is no evidence the claimant's mental disorders have resulted in delusions, grossly disorganized behavior, emotional withdrawal, psychomotor agitation, manic episodes, recurrent or severe panic attacks, or persistent or irrational fears. The evidence reflects the claimant initially sought psychiatric treatment upon advice of her physician, which indicates the claimant's symptoms not severe enough to prompt her to seek mental health treatment on her own. Although the claimant has mental impairments that impose some work-related restrictions, there is no evidence that she experiences recurrent and severe psychological disturbances due to these disorders.

(Tr. 25-26).

In discounting the opinion of Dr. Khan, the ALJ stated:

> I have also considered the opinion of Dr. Khan regarding the claimant's mental status. Dr. Khan indicated the claimant had poor ability to maintain concentration; understand, remember, and carry out simple job instructions; follow work rules; work with the public and others; function independently; and deal with stress. The above-stated residual functional capacity takes into consideration the claimant's limitations in working with stress and with the public. However, as discussed earlier in this decision, the overall evidence does not support a conclusion that the claimant lacks the ability to concentrate to perform simple, routine work, or that she cannot work with others. As noted

13

> earlier, the claimant performs simple activities of daily living and engages in church activities and shopping, which reflects she has the ability to concentrate and to work with and be around other people.

(Tr. 30). The ALJ also noted that Dr. Kahn's assessment was inconsistent with the findings of the State agency medical consultants, who found the plaintiff was not significantly limited in her ability to carry out short and simple instructions, make simple work related decisions, and work in coordination with or proximity to others without being distracted by them (Tr. 316). This court finds that the ALJ properly analyzed the opinions of Dr. Esteves-Jute and Dr. Kahn and that substantial evidence supports his decision.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court concludes that the ALJ's findings are supported by substantial evidence and recommends the decision of the Commissioner be affirmed.

s/Bruce H. Hendricks
United States Magistrate Judge

July 29, 2005

Greenville, South Carolina

14